IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

_____

STEPHEN M.. REID,

   Plaintiff,

  vs.             No.  10-CV-00781 WJ/LFG

THE HERTZ CORPORATION, and
SIMPLY WHEELZ, LLC d/b/a
ADVANTAGE-RENT-A-CAR,

   Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Defendants' Motion for Summary Judgment, filed April 28, 2011 (**Doc. 70**).  Having considered the parties' briefs and the applicable law, I find that Defendants' motion is well-taken and shall be granted.

### Background

This is a contract case in which Plaintiff contends he was entitled to a bonus amount which he did not receive.  The initial complaint was filed on July 22, 2010 in the First Judicial District Court, County of Santa Fe.  Defendants removed the case to federal court on August 20, 2010.

This Court has jurisdiction based on diversity under 28 U.S.C. § 1332.  Stephen Reid ("Plaintiff") is a New Mexico resident.  Defendant Hertz Corporation ("Hertz") is a Delaware corporation with a principal place of business in Park Ridge, New Jersey.  Defendant Simply Wheelz, LLC ("SWZ") is a Delaware limited liability corporation which does business under the

trade name Advantage-Rent-A-Car. SWZ's principal place of business is also Park Ridge, New

Jersey. Defendants Hertz and SWZ operate auto rental and leasing services in New Mexico

under the trade name Advantage-Rent-A-Car ("ARAC").[1]

The amended complaint (Doc. 41)[2] asserts claims of breach of contract, breach of the

covenant of good faith and fair dealing, promissory estoppel, and unjust enrichment.[3]  Plaintiff

was employed by Defendants on May 18, 2009.  When he was hired, he accepted the opportunity

to participate in the incentive plan called the "2009 Management Bonus Plan" ("MBP"), which

made him eligible for earning additional compensation from the date his employment started

through December 31, 2009.  Based on Plaintiff's calculations under the Plan, Plaintiff expected

to receive a bonus of almost $2 million.  Instead, Plaintiff received a bonus in the gross amount

of $22,500.00, and resigned from Defendant's employ shortly thereafter.  He contends that

Defendants owe him $1,768,200.00, less $22,500.00 paid to him as a bonus.

## II.    Undisputed Facts[4]

Plaintiff was the Area Manager for Advantage Rent-A-Car in Albuquerque, New

Mexico, from May 18, 2009 to March 26, 2010.

---

[1]  Plaintiff refers to the partnership between Hertz and SWZ as "Hertz/SWZ."

[2]  Plaintiff did not seek leave of Court before filing the Amended Complaint, as required under Fed.R.Civ.P. 15(a)(2), unless opposing party provides written consent.  The situations set forth under Rule 15(a)(1), allowing a party to amend a pleading as a matter of course do not apply here.  But based on the fact that Defendants have filed an Answer to the Amended Complaint (Doc. 42), the Court will assume that Plaintiff received that consent from opposing counsel.

[3]  In the response, Plaintiff withdrew his claim for unjust enrichment.  Doc. 72 at 29.

[4]  The facts set forth in this section are not disputed unless noted, and are supported by the parties' exhibits.  For ease of reading, references to supporting exhibits are omitted where possible.

A.      <u>Facts Relevant to Plaintiff's Employment</u>

Before working for ARAC, Plaintiff had been in the rental car business for several years. In the first part of 2009, before accepting the job with ARAC, Plaintiff was working as a consultant, but he was not satisfied with his compensation.  He sent out several resumes, but does not believe that he received other job offers.  When the job opportunity with ARAC arose, Plaintiff was already living in Albuquerque. He had heard that ARAC was planning on opening a location in Albuquerque and he wanted to get back into operations, so in April or early May 2009, he contacted Gary Fulena, ARAC's Vice President of Operations. ARAC was a newly acquired business for Hertz in 2009, Hertz having purchased it out of bankruptcy.

During a phone call in April 2009 , Mr. Fulena verbally offered the Area Manager job to Plaintiff at an annual salary of $70,000, which was a pay increase from Plaintiff's former employment as a consultant.  Plaintiff understood that there would be a bonus plan associated with the position. ARAC was still working out the details, so the plan was not yet available. Plaintiff did not have a specific idea of how much he could make under the bonus plan. With this understanding, Plaintiff accepted the job without knowing the details of ARAC's bonus program. Plaintiff was an at-will employee.

Plaintiff first received the ARAC bonus plan in June 2009.  Plaintiff was eligible to participate in the MBP for the final two quarters of 2009.  The plan year for the MBP was "[t]he calendar year commencing May 8, 2009 and ending December 31, 2009."  Ex. C, ¶ I(E). ARAC's 2009 MBP describes two types of bonuses for Area Managers: quarterly bonuses (which are not at issue in this case) and annual bonuses for above-goal performance. The standard for annual bonuses for Area Managers was $15,000.  Ex. C, App. B. When Plaintiff received the bonus plan document, he was already planning to work hard, although the plan gave

him an extra incentive. Plaintiff read the MBP document, and found some of the language confusing.  For example, he did not know what the term "binding contract" meant, nor what the term "in discretion" meant in ¶ III(I) of the MBP.  At some point in the fourth quarter of the plan year, Plaintiff talked to two other Area Managers about parts of the plan document that confused him, and found they were also confused.  Plaintiff did not ask anyone else other than these two other Area Managers regarding his confusion over some of the language in the MBP document.

The parties dispute over whether the MBP was simply a "guideline" or whether it was something more.  This issue forms the core of this lawsuit.  It is undisputed that several individuals involved in the company's compensation matters helped develop the MBP.  Karen Gittleman, Hertz' Compensation Manager, was a member of the management committee. Defendants' position is that the MBP document was a guideline or a kind of framework, and was not set in stone.  Defendants point to relevant provisions of the MBP which support their position that the committee has a right to make changes in response to business needs.  Plaintiff argues that the authority to make these changes is not absolute.

Plaintiff disputes that there was an actual "management committee," but presents no facts to support this contention.  There is evidence that the "management committee" was not a formal group, did not meet on a regular basis or in an organized fashion, and did not keep minutes.  *See* Ex. 2 at 58:14-19; Ex. 2 at 19:18-19; Ex. 3 at 44:1-4.  However, these characteristics are irrelevant to the material fact which states that there was a group comprised of individuals like Ms. Gittleman who participated in the development of the MBP, and had the authority to do so. These individuals included: Lynn Ferrera, senior director of global compensation programs (to whom Ms. Gittleman reported directly); Maureen O'Reagan, senior director of revenue management; Shona Navty, manager of revenue management for ARAC; Gary Fulena, Vice

4

President of Operations, and Mr. Groglio, Controller.  *See* Ex. 2 (Gittleman Dep.) at 19:18-22.

Ultimate approval of the MBP document had to be given by Joe Nothwang, Executive Vice

President, who did give this approval – albeit during a meeting of the committee, rather than on a

formal sign-off.  Ex. 2 at 19:10-17.  For these reasons, the Court will continue to refer to the

group of individuals who participated in the development of ARAC's bonus plan as the

"management committee."

B.     <u>Facts Relevant to the MBP Document</u>

      Plaintiff first received the ARAC bonus plan, or MBP document, in June 2009. He was

eligible to participate in the bonus plan for the final two quarters of 2009. The following are

relevant provisions of ARAC's 2009 MBP, with emphasis added by the Court.

**I(C) Effective Date and Term of Plan**
The plans are effective from May 8, 2009. This plan will continue until terminated, modified or
suspended by The Management Committee. . .

**I(D) No Contract**
This plan *does not constitute a binding contract* between the Advantage Corporation and
employees eligible for consideration for a discretionary bonus under the Plan. . .

**II(C) Amount of Bonus Award**
When granted, the award is based on the Company's performance against assigned objectives.
Participants will not be eligible for an award under the provisions of this Plan if 90 award points
are not achieved. Starting at 90% the percentage of Target Award continues to accrue at two
percentage points for each one point of achievement up to 145% then continues to accrue at one
percentage points for each one point of achievement. *There is no cap on the scale* . . .

**III(A) Plan Administration**
The Management Committee is empowered to interpret the plan and to make rules, regulations
and determinations within its provisions. Such determinations shall be binding on all parties . . .

**III(B) Modification or Suspension**
The Management Committee, *in its sole discretion, reserves the right to modify or suspend, or
terminate, in whole or in part, any or all provisions of this Plan* . . .

**III(C) New Hires, Transfers and Terminations**
Notwithstanding this provision, *the Management Committee may, at its discretion, make an*

*award to such participant in the amount it deems fair and appropriate . . .*

**III(E) Windfalls**
All extraordinary items defined as *windfalls must be identified and may be excluded in whole or in part from the computation of awards. Final determination of the impact of windfalls or bonus computations shall be at the discretion of The Management Committee . . .*

**III(F). Modification of Objectives**
In view of the possibility that unforeseen circumstances may occur during the program year which may drastically affect the achievement of predetermined objectives, a provision has been made for modifying objectives. . . . In any event, *any modification is at the sole discretion of the Company and must be approved by The Management Committee . . .*

**III(I) Award Approvals**
*All awards are in discretion of and require the approval of The Management Committee.*

C.      Facts Relevant to Plaintiff's Bonus

        The formula for Area Manager annual bonuses in 2009 was based on targets set for each area. *See* Ex. C at 5 & App. B; Ex. E (slide entitled "Plan Summary – Area Manager"). Plaintiff does not recall when he learned of the target (or "business plan") for his area, but his best recollection is that it was at the end of June 2009 or in the third quarter. As Area Manager, Plaintiff exceeded the business plan targets for the Albuquerque Area.

        The 2009 third quarter business plan called for the Albuquerque area to make a pre-tax profit of $5,000. In actuality, the third quarter pre-tax profit was $408,000. The 2009 fourth quarter business plan called for the Albuquerque area to lose not less than $6,000 before taxes. In actuality, it made a pre-tax profit of $223,000. *See* Exs. F & G. When similar year-end data is applied to the formula at issue, Plaintiff exceeded the target by 33,316% [sic], and the product of the formula is $2,498,699.83. Ex. J.

        At the end of July or early August 2009, Plaintiff did not have any idea what his annual bonus might be because he felt it was "too early in the game." Ex. A (Reid Dep.) at 81:21 - 82:1. Although it was still early by the end of August and the beginning of September 2009, "things

looked very positive" and the "numbers were very good." *Id*. at 82:5-17.  By the beginning of December 2009, Plaintiff had a "good guess" that he would be entitled to an annual bonus of "[w]ell over a million dollars." *Id*. at 81:1-9.  It was in January 2010 that Plaintiff first formed the opinion that he should have been paid a bonus of $1.7 million.  *Id*. at 80:8-25.  It was not until after Plaintiff filed this lawsuit, during discovery, that he first formed the opinion that he should have been paid a bonus of nearly $2.5 million.  *Id*. at 83:9-15.

On December 9, 2009, Gary Fulena conducted a PowerPoint presentation to explain the MBP and to answer any questions about it.  The PowerPoint file includes a slide that states there is no upper limit on earnings opportunities.  Each slide in the file (after the first slide) states: "This presentation is not an official plan document, and management reserves the right to amend the plans as needs arise."  Ex. E.[5]  Plaintiff disputes this fact by claiming he does not remember seeing that particular legend on the PowerPoint slides.  Lack of recollection does not create a material dispute of fact, particularly when the exhibits support Defendants' facts.

D.      Changes in the Calculation of Plaintiff's Bonus

In the fall of 2009, Ms. Gittleman identified Plaintiff's achievements in excess of the goal as a "windfall." The business plan for Albuquerque was not set the way it should have been, probably due to lack of prior knowledge about ARAC since it was a new acquisition.  Business plans that are "way off" result in windfalls or shortfalls. Ex. B at 50:6 – 53:15; Ex. D (Simply Wheelz Ans. to Interrog. No. 8).  Despite projections for the ARAC Albuquerque area, there was still uncertainty about revenue because it was considered a new business.  Ex. 2 at 110-111.

---

[5]  The copies of the PowerPoint slides show up text very faintly, but the legend does appear on the copies in the lower right hand corners. However, the same pages are included as an attachment to the Amended Complaint, and can be clearly read.  *See* Doc. 41, Ex. 2.

After the end of the year, ARAC capped Plaintiff's bonus – meaning that it was not calculated according to the formula measuring his performance against the business plan.  As a result, in March of 2010, Plaintiff received an annual bonus in the gross amount of $22,500.00.  This was a bonus of three times the $15,000 yearly standard for Area Managers, which was then cut in half because Plaintiff was bonus-eligible for only half of 2009.  Plaintiff resigned on March 26, 2010, shortly after receiving his bonus check.  He contends that Defendants owe him $1,768,200.00, less $29,500.00 paid to him as a bonus.

After he received his bonus check, Plaintiff heard from his supervisor, Dave Nabity, that his bonus had been capped.  Plaintiff's was not the only annual bonus that was capped.  Annual bonuses were also capped for the Area Managers in Miami, Ft. Lauderdale, and Phoenix/Tucson, for the same reason and in the same amount as Plaintiff's.

## III.    Legal Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed R. Civ. P. 56(c); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The moving party bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial; the nonmoving party may not rest on mere allegations or denials in her own pleadings. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256-57 (1986).  In order to avoid summary judgment, the nonmoving party must set forth enough evidence that a reasonable jury could return a verdict in the nonmovant's favor.  *Id.* at 249. A mere scintilla of evidence in the nonmovant's favor is not

sufficient to defeat a motion for summary judgment. *Id.* at 252.  Rather, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  *Id.* at 249-50 (citation omitted).

### Discussion

Initially, the MBP formula did not contain a cap on bonus earnings.  Plaintiff filed this lawsuit essentially because Defendants placed a cap on his expected bonus award after the end of the plan year as defined in the MBP.  Plaintiff contends that the MBP constitutes an enforceable agreement to pay him a bonus amount if the Albuquerque operations met certain goals set by Defendants, which he claims he exceeded.  Plaintiff also argues that the MBP was a material term and condition of the offer of employment which he accepted, that he relied on the promise of the MBP and fully performed his duties, obligations and responsibilities as Area Manager.

Defendants point out that Plaintiff was an at-will employee who was hired to work as the Area Manager for some of Defendants' operations in Albuquerque, New Mexico.  They contend that the MBP was not contractual in nature, did not form the basis of any contractual agreement between Plaintiff and Defendants at any time whatsoever, and was subject to the discretion of the management committee. Defendants further dispute that the MBP formed the basis for Plaintiff's decision to accept work with Defendants or that Plaintiff relied on it when he accepted employment; and thus, Plaintiff is not entitled to the amount claimed in the complaint.

Plaintiff's material facts ("PMF") offer nothing which would infer to a reasonable juror that the MBP constituted an express or implied contract.  The Court has reviewed Plaintiff's arguments based on these "material" facts, and finds all of them equally unavailing in creating a dispute over whether an implied contract existed to pay Plaintiff over $2 million in an annual bonus based on the MBP.

## I.        Breach of Contract

Section I(D) of the MBP states that the document is "No Contract," and "not a binding

contract. . . ."  Plaintiff claims that, despite this language, the bonus plan is an implied contract.

Whether an implied contract or agreement exists depends on "all the surrounding

circumstances, including the parties' words and actions," the way the parties dealt with each

other, and any writings, handbooks or procedures used by the employer.  *See* UJI 13-2302.  An

implied contract is created only where an employer creates a reasonable expectation. The

reasonableness of expectations is measured by just how definite, specific, or explicit has been

the representation or conduct relied upon. *Hartbarger v. Frank Paxton Co.*, 115 N.M. 665, 672

(1993); *see Garcia v. Middle Rio Grande Conservancy Dist.*, 1221 N.M. 728 (1996) (handbook

or manual can create implied contract if the handbook or manual controlled the employer-

employee relationship, and if the employee could reasonably expect employer to conform to the

manual).

The MBP has none of the characteristics of an implied contract.  The reasonableness of

expectations "is measured by just how definite, specific, or explicit has been the representation

or conduct relied upon." *Garrity v. Overland Sheepskin Co.*, 121 NM 710 (1996) (citing

*Hartbarger*, 115 N.M. at 672).  Expecting a $2.5 million bonus was overly optimistic as well as

unreasonable, because it was based on calculations contained in a bonus plan which explicitly

stated that the company could: modify, suspend or  terminate the plan in whole or in part;

exclude "windfalls" in whole or in part from the computation of awards; and which

unequivocally stated that all awards were in the discretion of, and required the approval of, the

management committee.  Based on this unequivocal language, there was no contract or

agreement to pay a bonus at all, much less a bonus calculated in the particular way advanced by

10

Plaintiff.  The "windfall" provision in the MBP addresses the absurdity of Plaintiff's bonus expectations.  Ms. Gittleman considered a $2.5 million bonus award to be a "windfall" which was a result of inaccurately targeted business plan for a new acquisition (ARAC) that had not yet been tested.  Ex. B at 51:17-18.  Awarding Plaintiff a $2.5 million annual bonus would far exceed the $631,000 pre-tax annual profit of the Albuquerque Area Plaintiff managed. What was unreasonable is Plaintiff's expectation of such a bonus amount based on a bonus plan which was ultimately in the discretion of the management committee.

Plaintiff's expectation of a bonus based on the MBP, as long as he continued making a profit for the company, is legally unfounded.  The bonus calculations set forth in the MBP did not give rise to an implied contract promising a bonus.  A similar situation occurred in *Hartbarger*, although that case involved job termination.[6]  The personnel handbook at issue in that case expressly provided that the company reserved the right to terminate any employee "without notice for any reason." 115 N.M. at 713.  The plaintiff alleged that the handbook constituted an implied contract which protected him from firing except for just cause, based on a list of offenses contained in the handbook which could lead to discharge, and on a manager's statement that "as long as [the employee] kept up his sales and took care of what he was doing he would not have anything to worry about." *Id.* at 674.  The New Mexico Supreme Court found that the manager's statement was simply reassurance about job security to the plaintiff during a time when the company might be sold. The Supreme Court also found that the list of offenses in the handbook did not limit in any way the employer's right to make discharge decisions.

---

[6]  Defendant comments that there are no "implied bonus contract" cases in New Mexico, and the Court's own research has uncovered none.  Nevertheless, cases such as *Hartbarger* are helpful because the analysis would follow along the same lines.

Plaintiff's reliance on *Malone v. American Business Information, Inc.*, 647 N.W. 2d 569 (Neb. 2002), to argue that the MBP entitles him to a $2 million annual bonus is misplaced. *Malone* involved a contractually enforceable commission plan, which is not the case here. Further, the bonus plan in *Malone* was also subject to change at management's discretion, but the bonuses themselves were not specified to be discretionary, as they are in this case.

Although not a New Mexico case, *Sell v. Hertz Corp.*, 746 F. Supp. 2d 1206 (D. Utah 2010), is factually similar to this case.  In *Sell*, the district court held that no implied contract for payment of quarterly bonus to management employee existed.  In addition to a bonus plan, plaintiff in that case received an "Appendix I" which stated that Location Managers were eligible to receive a bonus, but not that they were entitled to one.  In addition, bonus documents showed only how bonuses were calculated and stated only that managers were eligible for bonuses, not that they were entitled to bonuses, bonus documents were not signed or identified as agreements, and the bonus plan itself clearly stated that employer had complete discretion to determine bonus awards.[7]

By contrast, in *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1148 (D.C. Cir. 1984), Justice Scalia (then sitting on the D.C. Court of Appeals) found that material fact issues existed as to whether the employer breached a compensation plan by manipulating salesman's quota plan and terminating his employment in such a manner as to considerably reduce the commissions due him, precluding summary judgment.  However, that case involved a "compensation plan" rather

---

[7] *See also Ferrand v. Credit Lyonnais*, 2003 WL 22251313, 13 (S.D.N.Y. 2003) (holding that plaintiff was precluded from raising a claim for an implied contract for a guaranteed bonus where there was an explicit policy in the Bank's Employee Handbook setting forth a policy of discretionary bonuses).

than a bonus plan, under which the plaintiff was *entitled* to commissions on all sales in excess of designated annual sales quotas.  In this case, it is undisputed that bonuses are not part of salary compensation, Ex. 2 at 39-41, nor do bonuses measure an individual's performance,  Ex. 2 at 35-36.

A.     Plaintiff's "Performance" Under the MBP

For example, Plaintiff contends that Hertz' offer letter of employment, together with Plaintiff's participation in the MBP and the sections of the plan describing methods of calculation for bonuses, constituted a "promise" of a bonus to Plaintiff.  He claims that a reasonable juror could infer that he is entitled to the $2 million bonus because he "performed" under the terms of the MBP. Plaintiff also contends that the lack of discretionary language in the MBP provisions describing calculations of bonuses means that the calculations form an implied contract.

New Mexico law requires that a contract be read as a harmonious whole, with every word or phrase given meaning and significance according to its importance in the context of the whole contract.  *See Bank of New Mexico v. Sholer*, 102 N.M. 78, 79 (1984).  Each page of the MBP need not mention the discretionary nature of the plan where it is plainly asserted elsewhere in the plan.  Even the PowerPoint presentation, which described the calculation methodology for the bonuses, repeated on each slide that the management reserves the right to amend the plan as needs arise.  Ex. 7 & Ex. 2 (attached to Doc. 41).  Thus, Defendants' offer of employment and the bonus plan did not provide a basis from which Plaintiff could have a reasonable expectation of the $2 million bonus.  To do so would require completely overlooking the discretionary language in the plan.  In addition, Plaintiff fails to take into account "target incentive award opportunities" which were set for different categories of plan participants.  Ex. C, I(F) (Award

13

Opportunities).  The target annual incentive award for area managers is listed as $15,000.  Ex. C,

App. B.  Together with the discretionary language in the MBP as well as the target objective

listed for area managers like himself, no juror would find it reasonable for Plaintiff to have

expected an annual bonus of over $2 million.

Section I(D) of the MBP states that it "does not constitute a binding contract between the

Advantage Corporation and employees eligible for a discretionary bonus."  Plaintiff contends

that this is an unenforceable disclaimer, then goes on to argue that even if it is enforceable, the

provision applies only to ARAC, and not Hertz. Plaintiff relies on the omission of "Hertz" in the

language to mean that Plaintiff *did* have a contract with Hertz based on the fact that Hertz

employees (like Karen Gittleman) drafted the MBP.  This argument is illogical as well as

irrelevant. Regardless of whether Plaintiff was employed by Hertz, he was eligible for bonuses

only through the ARAC bonus plan.  The fact that ARAC is a division of Hertz did not preclude

ARAC from developing its own bonus plan for ARAC/Hertz employees; nor does the absence of

the word "Hertz" from that provision bind Hertz in any way to the plan.  Finally, even if this

argument made any legal sense, it would fail, since the award of bonuses would still be

discretionary.

The fact that Plaintiff "performed" in expectation of a bonus calculated under the terms

of the MBP does not in itself give rise to the existence of an implied contract.  Both sides must

provide consideration in order to obligate both sides to a contract. *Talbott v. Roswell Hosp.*

*Corp.*, 138 N.M. 189, 193 (Ct. App. 2005).  In addition, consideration which is adequate to

support a promise must be bargained for by the parties.  *Id.* (citing *Romero v. Earl*, 111 N.M.

789, 791 (1991)).  Defendants may have "bargained" for Plaintiff's performance under the terms

of the MBP, but those terms did not *promise* a bonus based on the calculations in the MBP

14

because the award of bonuses, were always in the discretion of the management committee.

Plaintiff also disputes Defendants' characterization of the MBP as a "guideline" because the term "guideline" is not included in the language of the document. *See* Ex B at 49:13-50:2 (Ms. Gittleman's reference to the MBP as a "framework" or "guide"); Ex. 2 at 63: 25.  Plaintiff is correct that Defendant's reference to the MBP as a "guideline" in itself does not make the MBP a guideline.  PMF 37, 38, & 39. However, if the bonus plan is not a contract (which the Court has determined it is not), Ms. Gittleman's description of the MBP as a "guideline" or "framework" is not inaccurate.

B.      Notice to Plaintiff of Plan Changes

Plaintiff also argues that Defendants were allowed to change the "rules" in the MBP only before midnight on December 31, 2009, and only with advance notice to him.  This argument is not plausible under a plain reading of the MBP, which explicitly defines December 31st as the end of the plan year for purposes of calculating bonuses.  Ex. C, I(E) ("Definition of Terms"). There is evidence that Ms. Gittleman had some "concern" about changing the "rules of the game" after the plan year had ended.  Ex. 2 at 83.  At the same time, she stated that the need for plan modification may not become evident until after the plan year ended.  Ex. 2 at 107:21-25. At that point, the company would consider whether it could afford to pay such bonuses based on the company's pre-tax revenue and operating expenses.  Ex. 3 at 63:2-64:4.  In other words, Defendant had discretion to determine whether any profits would effectively be lost to such bonuses given not only to Plaintiff but also other area managers who had "windfalls" of this kind based on the calculations in the MBP.

The target, or business plan, set by Defendants for Albuquerque and other locations was a basic component for determining the amount of the bonus. If targets had been set higher for

Albuquerque, Plaintiff would have earned less bonus. Defendants did change the goals for other locations for the fourth quarter; but not for Albuquerque. These changes resulted in modified bonus awards for those managers more in line with the target incentive award opportunities for different categories of managers. *See* App. to Ex. C.

It is undisputed that Defendants did not modify the MBP to include bonus caps until February or March of 2010 (Ex. 2 at 128; Ex. 3 at 43:1- 4). Ms. Gittleman had some concern as early as October 2009 about the large amount of bonus that would have to be paid in the Albuquerque area if the "trend" continued. Ex. 5. There were similar concerns over the bonuses for area managers in Miami, Ft. Lauderdale, Phoenix/Tucson and Salt Lake City. The over-target bonuses for those area managers were also capped below what they would have received based on the calculations set out in the MBP. Ex. D (Interrog. No. 9).

Plaintiff's facts on this issue (PMF 11-15; 24-29) are not disputed: Defendants did not impose caps until after the plan year ended; Plaintiff was unaware that his bonus would be capped until he received his bonus check in March 2010; and the imposition of caps on bonuses for 2009 is significantly different from the information contained in the MBP, which stated that there was no cap in the calculation of awards. Ex. C, II(C). However, these facts do not create a material dispute. Defendants might have changed the business plan for Albuquerque in October 2009 when Ms. Gittleman identified the developing windfall situation, *see* Ex. 5, but nothing required them to do so. Ex. 2 at 102-03 (citing to parts of MBP giving management committee discretion over terms of plan and over award of bonuses). It would have been preferable for Defendants to give advance notice to Plaintiff of a possible change in the bonus calculations, prior to the end of the plan year. However, because the management committee had the ability to change the bonus plan, *see* Ex. 2 at 102-03, 107, and because an award of bonuses in itself

16

was discretionary, Plaintiff's facts do not create a material dispute regarding whether Defendants were contractually obligated to pay Plaintiff any bonus at all, much less a bonus of over $2 million.  One might wonder why ARAC would bother providing employees with the details of a bonus plan if, in the end, an award of bonuses were entirely discretionary.  In response to that question, Ms. Gittleman stated that the MBP was a "guideline" to inform employees "how their incentives will be calculated to . . . convey what business objectives we have for them in that year."  Ex. 2 at 107:3-9.  This explanation may be weak, but it does not create a dispute concerning whether the MBP was an implied contract.

C.      <u>Ambiguity</u>

        Plaintiff points to the omission of certain language which creates an ambiguity in the MBP which must be resolved by a fact finder.[8]  Whether an ambiguity exists is a question of law to be decided by the court.  *Villella Enters., Inc. v. Young*, 108 N.M. 33, 38 (1988).  A term or provision is ambiguous when it is susceptible to reasonable but conflicting meanings. *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 509 (1991).

        Plaintiff argues that a reasonable juror could infer that the omission of specific language in the MBP stating that the management committee has discretion to determine the *amount* of a bonus award means that the committee had no such discretion at all.  This argument is specious. The specific language in the MBP describes *all* awards as discretionary, and bestows upon the management committee the broad discretion to suspend or terminate all of the provisions in the plan.  This express language leaves no doubt that, if the committee has discretion over whether to award a bonus at all, it also has discretion over the *amounts* of bonuses.

─────────────────

        [8]  The Court's discussion of ambiguity assumes, for argument's sake, that there is an implied contract. However, the Court has already determined that no contract existed.

Plaintiff also contends that the language in Section III(I) concerning the discretionary nature of awards is ambiguous based on a supposed grammatical error, namely, that "discretion" is a noun.[9]  PMF 31.  This argument, if there is one, is unclear.  The Court assumes that Plaintiff is arguing that "discretion" is a noun but is not used as a noun in the provision.  If so, the argument is faulty, and borders on the ridiculous.  "Discretion" is indeed used as a noun – specifically, as an object of the preposition "in."  Further, it would not matter whether the word was changed to an adjective ("All awards are *discretionary* . . .") or whether the article "the" was added to make the phrase more grammatically correct ("in *the* discretion of. . . ").  The meaning is unmistakable: the management committee has ultimate authority over the disposition of bonuses, including whether bonuses are to be paid and the amounts of any such bonuses.

There is evidence of some confusion over the plan.  Dave Nabity, Mr. Reid's General Manager, testified that the entire MBP was somewhat confusing and that he never understood the plan.  PMF 32; Ex. 6 at 10:23-25 ("The entire plan is somewhat confusing as far as percentages of targets. . . .").  Mr. Nabity stated that other area managers called him with questions about the MBP which he could not answer because the plan was confusing.  Ex. 6 at 17:16-18; 18:24-19:3.  Plaintiff read the bonus plan document after he received it.  Ex. 4 at 54:19-24.  He found some of the language confusing.  For example, he did not know the meaning of terms such as "binding contract" or "in discretion," nor did he understand the phrase "All other requests" in Section III(I).  Ex. 4 at 54:25-56:10.  There is also typographical error in

---

[9]  Section III(I) states that "All awards are in discretion of and require the approval of The Management Committee."

18

Section III(I) where the word "not" is missing.[10]

Despite the grammatical or syntactical errors pointed out by Plaintiff, and confusion over the calculation method in the MBP, there is no ambiguity in the provisions concerning the discretionary nature of the bonuses. Plaintiff did not express confusion over other parts of the MBP which state unequivocally the discretionary nature of bonuses: Section III(A) ("The Management Committee is empowered to . . . make . . . determinations" regarding the bonus plan, and that such determinations were "binding on all parties"); and Section III(E) ("All extraordinary items defined as windfalls . . . may be excluded in whole or in part from the computation of awards" and that such determinations "shall be at the discretion of the Management Committee.").  None of the evidence presented by Plaintiff renders those provisions susceptible to two reasonable, but conflicting, meanings.

Plaintiff also contends that the language in Section III(H) is ambiguous because it suggests that the management committee's discretion extends only to bonuses "above and beyond" the award as calculated under the MBP. Ex. 4 at 82:1-10.  Section III(H) reads: "Except as otherwise provided for herein, awards are discretionary and shall not be considered wages or compensation for individual performance."  Plaintiff's interpretation of the provision is not a reasonable reading of the provision when read together with other parts of the plan, particularly with the language in section III(I), which states that "*all* awards are in discretion of and require approval of the Management Committee" (emphasis added).

Based on the undisputed facts, I find that the MBP does not require notice to Plaintiff of

_____

[10]  That provision reads: "All other requests or recommendations or payments, written or oral. . . will [not] be considered unless approved in advance by the Management committee in writing."

changes to the way in which bonuses might be computed.  The plain language of the bonus plan allowed ARAC to have the final say on the award of bonuses (which would necessarily include amounts of bonuses).  ARAC also had the discretion to modify, suspend, or terminate the plan, and to exclude windfalls in the calculation of bonuses.  Plaintiff offers no evidence suggesting that December 31, 2009 was anything other that the date on which the plan year ended.  Further, there are no facts from which a reasonable juror could infer that Plaintiff was entitled to a bonus of over $2 million if no plan changes were made in 2009.  Defendants are therefore entitled to summary judgment on Count I of the amended complaint.

## II.      Breach of Covenant

In Count II, Plaintiff asserts a claim for breach of the implied covenant of good faith and fair dealing.  Under New Mexico law, a duty of good faith and fair dealing exists in every contract. *See Jaynes v. Strong-Thorne Mortuary, Inc.*, 124 N.M. 613, 618 (1997). The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement.  *Planning & Design Solutions v. City of Santa Fe*, 118 N.M. 707, 714, 885 P.2d 628, 635 (1994). A breach of the covenant of good faith and fair dealing requires a showing that the breaching party intentionally used the contract to injure the other party; negligent conduct is insufficient. *Jaynes*, 124 N.M. at 618.

Several jurisdictions have permitted suit for breach of an implied covenant of good faith and fair dealing in an employment contract. *Melnick v. State Farm Mut. Auto. Ins. Co.*, 749 P.2d 1105, 1109 & n.2 (N.M. 1988). These courts have defined "bad faith" as conduct by the employer extraneous to the employment contract aimed at frustrating the employee's enjoyment of contractual rights, and have equated "bad faith" with fraud, deceit, or misrepresentation. *Id.* at

20

1109. There are no facts in this case suggesting that Defendants acted with the goal of frustrating

Plaintiff's enjoyment of any contractual rights. *Id*. at 730.  Instead, the undisputed facts show

that ARAC was exercising its discretionary rights under the express terms of the MBP to avoid

paying a huge windfall bonus, but awarded Plaintiff triple times the half-yearly standard for Area

Managers.  Further, Plaintiff was not singled out, since the annual bonuses for several other Area

Managers were also capped for the same reasons.  No reasonable juror would view this as bad

faith, in light of the clear language in the bonus plan allowing ARAC such complete discretion in

the award of bonuses.

However, this claim fails as a matter of law regardless of whether there was bad faith on

Defendants' part.  New Mexico courts have declined to recognize a cause of action in an at-will

contract for breach of an implied covenant of good faith and fair dealing.  *See Bourgeous v.*

*Horizon Healthcare Corp*., 117 N.M. 434, 439 (1994); *Melnick*, 106 N.M. at 730.  In *Melnick*,

the New Mexico Supreme Court affirmed the trial court's judgment entered pursuant to a

directed verdict, "not because there was a complete absence of evidence of bad faith to support

Melnick's claim, but because [New Mexico courts] do not recognize a cause of action for breach

of an implied covenant of good faith and fair dealing in an at-will employment relationship."  *Id*.

at 730 (citations omitted).  It is undisputed that Plaintiff was employed at-will.  Thus, regardless

of whether was any evidence of bad faith on the part of Defendants, Plaintiff cannot sustain this

claim.  Defendants are entitled to summary judgment on Count II as well.

## III.    Promissory Estoppel

Count III asserts a claim for promissory estoppel.  The essential elements of this claim

are: (1) an actual promise must have been made which in fact induced the promisee's action or

forbearance; (2) the promisee's reliance on the promise must have been reasonable; (3) the

promisee's action or forbearance must have amounted to a substantial change in position; (4) the promisee's action or forbearance must have been actually foreseen or reasonably foreseeable to the promisor when making the promise; and (5) enforcement of the promise is required to prevent injustice.  *Strata Production Co. v. Mercury Exploration Co*., 121 N.M. 622 (1996); NM-UJI 13-815.

Plaintiff claims that he has presented evidence from which a reasonable juror could infer that he reasonably relied on promises made by Defendants, to his detriment.   He contends that Defendants made specific promises and representations to him in the employment offer letter, the MBP and the Power Point Presentation; that he reasonably relied on those promises and representations by accepting the job as area manager and continuing his employment after he received MBP in June 2009.  He heard those promises reaffirmed during the Power Point Presentation of December 9, 2009.  Plaintiff contends that his reliance on the promises was reasonable and foreseeable to Defendants since Defendants designed the plan with no caps to motivate and encourage Mr. Reid and others to meet or exceed profit and revenue goals set by the company.  Plaintiff measures his economic loss by the bonus amount which Defendants refused to pay over $2 million based on the computations in the MBP, and which he claims he earned under that bonus plan.

Plaintiff has presented no evidence or testimony which would suggest that Defendants made a promise that he would receive a bonus of over $2 million.  In fact, the undisputed facts show that neither the MBP nor the PowerPoint presentation promised a bonus.  Nor did Plaintiff rely on promises made by Defendant regarding bonuses. Plaintiff accepted employment with ARAC without the details of the MBP. He did not receive the plan details until at least two months after he started working.  Am. Compl. ¶¶ 8-11. Thus, Plaintiff relied only on the

*opportunity* to receive a bonus, which he did in fact receive.

Moreover, even if Plaintiff relied on the any promises or representations made, such reliance would have been unreasonable. The MBP contained clear and repeated language that bonus awards were discretionary; that the management committee was empowered to make changes as necessary; that windfalls may be excluded from the computation of awards. The yearly bonus standard for Area Managers was $15,000 (Ex. C, App. B). Every slide in the PowerPoint presentation (other than the initial slide) also contained similar language. Am. Compl., Doc. 41, Ex. 2 (copies of PowerPoint slides noting that the program was "not an official plan document and management reserves the right to amend the plan as needs arise"). Am. Compl., Doc. 41, Ex. 2. Based on all this information which was readily apparent to Plaintiff, any reliance on a bonus award amounting to over $2 million would have been unfounded, and even foolhardy. Thus, any loss incurred by Plaintiff cannot be the sustained as damages from a claim of promissory estoppel.

Based on the foregoing reasons, Defendants are entitled to summary judgment on the promissory estoppel claim in Count III of the Amended Complaint.

## IV.   Unjust Enrichment

Plaintiff has withdrawn his claim for unjust enrichment.

### Conclusion

In sum, I find and conclude that:

1.   *Count I: Breach of Contract.*  Plaintiff has presented no facts from which a reasonable juror could infer that Defendants agreed and intended to pay Plaintiff a very large bonus as calculated according to the MBP plan and Appendix B pertaining to Area Managers. The ARAC bonus plan is neither an express nor an implied contract. Based on the undisputed facts, the

award of bonuses was discretionary and the management committee reserved to right to make changes in the bonus plan without advance notice to Plaintiff.  Summary judgment is therefore granted to Defendants on Count I alleging Breach of Contract.

2.       *Count II: Breach of Covenant of Good Faith and Fair Dealing.*  New Mexico law does not recognize this cause of action in an at-will employment relationship.  It is undisputed that Plaintiff was employed at-will.  Thus, regardless of whether there had been any evidence of bad faith on the part of Defendants (and the Court has found there is no evidence of such conduct), Plaintiff cannot sustain this claim.  Therefore, Defendants are entitled to summary judgment on Count II as well.

3.       *Count III: Promissory Estoppel.*  Plaintiff has presented no material factual dispute to suggest that Defendants made promises or representations on which Plaintiff relied.  Based on the undisputed facts, any reliance on Plaintiff's part would have been unreasonable. Thus, Defendants are entitled to summary judgment on the promissory estoppel claim in Count III of the Amended Complaint.

4.       *Count IV: Unjust Enrichment*.  Plaintiff has withdrawn this claim.

In light of the Court's findings herein, the Court agrees with Defendants that there is no evidence to support Plaintiff's claim for punitive damages.

Having set forth these findings, I am compelled to make some observations regarding this lawsuit.  The Court has come to its conclusion based on the law, but the Court's findings make common sense as well.  Plaintiff's annual salary was $70,000, and yet Plaintiff calculated that he would receive a bonus of over $2 million based on the MBP.  One might wonder how, after working for seven months and actually earning about $41,000, one might reasonably expect to be paid a bonus amounting to almost *fifty* times that amount.  In the face of all the information

24

known to Plaintiff, despite a lack of notice concerning the decision to cap his bonus, such an expectation is unrealistic and unfounded.

Defendants are also partly at fault for finding themselves at the opposite end of this lawsuit, even though they prevailed on legal grounds.  Plaintiff exceeded the profit and revenue goals of the business plan set by Defendants, but Defendants were not required to pay the bonus amount as calculated under their own plan because legally they were not required to do so.  The Court recognizes that a business cannot stay in business giving out bonuses that exceed profits. At the same time, it does not make sense to set up detailed methods of bonus calculation in order to "motivate" an employee who is trying to chase a juicy carrot when in the end, Defendants have the legal option of yanking the carrot from the employee's reach. It also does not seem to make much sense, from a motivational angle, to uncap bonus award opportunities only to arbitrarily slash bonus amounts that were computed according to the calculations based on Defendants' own plan.

**THEREFORE,**

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (**Doc. 70**) is hereby GRANTED for reasons described in this Memorandum Opinion and Order.  A Judgment will be entered contemporaneously with this Memorandum Opinion and Order.

_____
UNITED STATES DISTRICT JUDGE